1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

JOSEPH GIRARD,

                Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                Defendant.

NO.  C11-549-JCC-JPD

REPORT AND
RECOMMENDATION

      Plaintiff Joseph Girard appeals the final decision of the Commissioner of the Social

Security Administration ("Commissioner") which denied his applications for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act, 42 U.S.C. §§ 401-33 and 1381-83f, after a hearing before an

administrative law judge ("ALJ").  For the reasons set forth below, the Court recommends that

the Commissioner's decision be AFFIRMED.

           I.        FACTS AND PROCEDURAL HISTORY

      At the time of the administrative hearing, plaintiff was a fifty-five year old man with a

high school education and some additional training.  Administrative Record ("AR") at 34.  He

was last gainfully employed as a minibus driver for an assisted care facility in October 2005.

AR at 34, 181-82.  His past work experience also includes employment as a seed processor, sales associate at Wal-Mart, food service employee for the Washington State ferries, and voucher examiner or cashier for the United States Government.  AR at 35-38, 181-82.

On December 1, 2005, and December 20, 2005, plaintiff filed claims for DIB and SSI, respectively.  In both applications, plaintiff alleged an onset date of October 20, 2005.  AR at 126-38, 165.  Plaintiff asserts that he is disabled due to degenerative joint disease in his spine, syncope of unknown etiology, asthma, chronic obstructive pulmonary disease, and sleep apnea. Dkt. 14 at 4.

The Commissioner denied plaintiff's claim initially and on reconsideration.  AR at 71-74, 78-82.  Plaintiff requested a hearing which took place on December 4, 2008.  AR at 26-58. On February 2, 2009, the ALJ issued a decision finding plaintiff not disabled and denied benefits based on his finding that plaintiff could perform his past relevant work as a cashier. AR at 25.  On February 3, 2001, the Appeals Council denied plaintiff's request for review, making the ALJ's ruling the "final decision" of the Commissioner as that term is defined by 42 U.S.C. § 405(g).  AR at 1-6.  On April 18, 2011, plaintiff timely filed the present action challenging the Commissioner's decision.  Dkt. 3.

## II.  JURISDICTION

Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## III.  STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits when the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th

Cir. 2005). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 201 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving any other ambiguities that might exist. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). While the Court is required to examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). When the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld. *Id.*

The Court may direct an award of benefits where "the record has been fully developed and further administrative proceedings would serve no useful purpose." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)). The Court may find that this occurs when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence.

*Id.* at 1076-77; *see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that erroneously rejected evidence may be credited when all three elements are met).

## IV.    EVALUATING DISABILITY

As the claimant, Mr. Girard bears the burden of proving that he is disabled within the meaning of the Social Security Act (the "Act"). *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (internal citations omitted). The Act defines disability as the "inability to engage in

any substantial gainful activity" due to a physical or mental impairment which has lasted, or is expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled under the Act only if his impairments are of such severity that he is unable to do his previous work, and cannot, considering his age, education, and work experience, engage in any other substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

The Commissioner has established a five step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof during steps one through four. At step five, the burden shifts to the Commissioner. *Id.* If a claimant is found to be disabled at any step in the sequence, the inquiry ends without the need to consider subsequent steps. Step one asks whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b).[1] If he is, disability benefits are denied. If he is not, the Commissioner proceeds to step two. At step two, the claimant must establish that he has one or more medically severe impairments, or combination of impairments, that limit his physical or mental ability to do basic work activities. If the claimant does not have such impairments, he is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant does have a severe impairment, the Commissioner moves to step three to determine whether the impairment meets or equals any of the listed impairments described in the regulations. 20 C.F.R. §§ 404.1520(d),

---

[1] Substantial gainful activity is work activity that is both substantial, i.e., involves significant physical and/or mental activities, and gainful, i.e., performed for profit. 20 C.F.R. § 404.1572.

416.920(d).  A claimant whose impairment meets or equals one of the listings for the required twelve-month duration requirement is disabled.  *Id.*

When the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, the Commissioner must proceed to step four and evaluate the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).  Here, the Commissioner evaluates the physical and mental demands of the claimant's past relevant work to determine whether he can still perform that work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If the claimant is able to perform his past relevant work, he is not disabled; if the opposite is true, then the burden shifts to the Commissioner at step five to show that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 416.920(g); *Tackett*, 180 F.3d at 1099, 1100.  If the Commissioner finds the claimant is unable to perform other work, then the claimant is found disabled and benefits may be awarded.

## V.      DECISION BELOW

On February 2, 2009, the ALJ issued a decision finding the following:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.     The claimant has not engaged in substantial gainful activity since October 20, 2005, the alleged onset date.

3.     The claimant has the following severe impairments: obesity, chronic obstructive pulmonary disease, asthma, and low back pain.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of sedentary work, including the abilities to: lift/carry 10 pounds

occasionally, and less than 10 pounds frequently; stand/walk two
hours in an eight hour workday; sit six hours in an eight hour
workday; push/pull without limitation; climb ramps or stairs
occasionally, but never ladders, ropes, or scaffolds; stoop, balance,
kneel, crouch, or crawl occasionally; and the claimant should avoid
concentrated exposure to vibration, fumes, odors, dusts, gases, poor
ventilation, and hazards.

6.    The claimant is capable of performing past relevant work as a cashier
      I.  This work does not require the performance of work-related
      activities precluded by the claimant's residual functional capacity.

7.    The claimant has not been under a disability, as defined in the Social
      Security Act, from October 20, 2005 through the date of this decision.

AR at 16-25.

## VI.    ISSUES ON APPEAL

The principal issues on appeal are whether the ALJ erred in evaluating the medical

opinions of treating physicians Robert Rieger, M.D. and Theodore Hegg, M.D., and examining

physician Gary Gaffield, M.D.  Dkt. 14 at 7; Dkt. 15 at 2.

## VII.    DISCUSSION

A.    <u>The ALJ Did Not Err in Evaluating the Medical Opinion Evidence</u>

*1.    Standards for Reviewing Medical Evidence*

As a matter of law, more weight is given to a treating physician's opinion than to that

of a non-treating physician because a treating physician "is employed to cure and has a greater

opportunity to know and observe the patient as an individual."  *Magallanes v. Bowen*, 881 F.2d

747, 751 (9th Cir. 1989); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  A treating

physician's opinion, however, is not necessarily conclusive as to either a physical condition or

the ultimate issue of disability, and can be rejected, whether or not that opinion is contradicted.

*Magallanes*, 881 F.2d at 751.  If an ALJ rejects the opinion of a treating or examining

physician, the ALJ must give clear and convincing reasons for doing so if the opinion is not

contradicted by other evidence, and specific and legitimate reasons if it is. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1988). "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (citing *Magallanes*, 881 F.2d at 751). The ALJ must do more than merely state his conclusions. "He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citing *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)). Such conclusions must at all times be supported by substantial evidence. *Reddick*, 157 F.3d at 725.

The opinions of examining physicians are to be given more weight than non-examining physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Like treating physicians, the uncontradicted opinions of examining physicians may not be rejected without clear and convincing evidence. *Id.* An ALJ may reject the controverted opinions of an examining physician only by providing specific and legitimate reasons that are supported by the record. *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005).

Opinions from non-examining medical sources are to be given less weight than treating or examining doctors. *Lester*, 81 F.3d at 831. However, an ALJ must always evaluate the opinions from such sources and may not simply ignore them. In other words, an ALJ must evaluate the opinion of a non-examining source and explain the weight given to it. Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *2. Although an ALJ generally gives more weight to an examining doctor's opinion than to a non-examining doctor's opinion, a non-examining doctor's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Orn*, 495 F.3d at 632-33.

2.     *Robert Rieger, M.D.*

Dr. Rieger has been serving as plaintiff's treating physician since late 2006.  AR at 346-401.  At that time, plaintiff complained of cough and shortness of breath, hypotension possibly related to "drop attacks," and chronic back pain.  AR at 390.  Dr. Rieger opined that plaintiff's chronic back pain was likely secondary to degenerative arthritis, but he commented that he doubted that plaintiff was a surgical candidate.  AR at 390.  In November 2006, Dr. Rieger noted plaintiff's pain was "stable."  AR at 288.  He observed that plaintiff's "drop attacks" were not completely resolved, but improved.  An additional diagnosis of chronic obstructive pulmonary disease ("COPD") was also noted, but plaintiff refused to quit smoking.  AR at 388.  In February 2007, plaintiff reported having increased leg pain to Dr. Rieger, who prescribed Neurontin.  AR at 283.

On May 27, 2008, Dr. Rieger opined that plaintiff could sit for one to two hours, although he would need to get up and move around every ten to fifteen minutes, and that he could stand/walk for one to two hours, though not continuously.  AR at 457.  In addition, Dr. Rieger opined that plaintiff can only tolerate low work stress, as plaintiff has "very low coping mechanisms due to chronic illness."  AR at 457.   He concluded that "I believe due to sig[nificant] complicated medical illness that [plaintiff] will have a significant problem with [any] employment."  AR at 461.

In November 2008, Dr. Rieger completed a questionnaire regarding plaintiff's limitations.[2]  AR at 445-53.  In that form, Dr. Rieger opined that plaintiff could only sit for one to two hours, stand/walk for one to two hours, and needed to get up and move every five

_____

[2] Although the ALJ and the parties refer to this form as having been completed in January 2008, the questionnaire is actually dated November 24, 2008.  AR at 445-53.  The questionnaire also refers to the most recent exam as having been completed on November 21, 2008.  AR at 446.

minutes. AR at 448. He stated that plaintiff could occasionally lift and carry no more than 10 to 20 pounds, and was unable to repetitively reach, handle, finger, or lift due to his back. AR at 450. Dr. Rieger further opined that plaintiff could only tolerate low work stress, and was unable to perform a full time competitive job that required activity on a sustained basis. AR at 451. Finally, Dr. Rieger noted that plaintiff needs to avoid fumes, gases, and temperature extremes, and that he can perform no pushing, pulling, kneeling, bending, or stooping. AR at 452. Dr. Rieger estimated that plaintiff has been disabled to this degree since June 2005. AR at 452.

The ALJ found Dr. Rieger's November 2008 questionnaire "unsupported" by the medical record. AR at 24. Specifically, the ALJ asserted that "Dr. Rieger offered no specific explanation for these draconian limitations in the [November 2008] questionnaire. Further, significant examination of the claimant, particularly neurological, were noticeable absent from his clinical notes." AR at 24. The ALJ stated that "[i]n fact, it appears that Dr. Rieger primarily recorded the claimant's subjective reports and referred the claimant for evaluation by other clinicians. Thus, his clinical notes cannot be used to explain the limitations he cited in the questionnaire. Treating physicians are only accorded controlling weight with regard to opinions about the nature and severity of impairments, and only if it is well supported by medically acceptable clinical and laboratory techniques, and is not inconsistent with the other substantial evidence in the record." AR at 25. Moreover, the ALJ stated that "it is well settled law that check-off reports that do not contain explanation of the reasons for their conclusions may permissibly be discounted. " AR at 25 (citing *Crane v. Shalala*, 76 F.3d 251 (9th Cir. 1996)). As a result, the ALJ found that "Dr. Rieger's assessment of the claimant's symptoms and functionality expressed in this conclusory form shall be given little weight." AR at 25.

The ALJ offered several specific and legitimate reasons for rejecting Dr. Rieger's opinion in this case. First, the record supports the ALJ's finding that Dr. Rieger's treatment notes do not reflect examinations of the claimant that support the limitations set forth in the questionnaire. An ALJ is not required to accept a medical opinion that is inadequately supported by medical findings. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (holding that an ALJ may discount treating physicians' opinions that are brief, conclusory, unsupported by the record as a whole or by objective medical findings, and based on the plaintiff's "subjective complaints without objective evidence"); *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (holding that an ALJ may discount the conclusory opinion of an examining or treating physician if the opinion is unsupported by clinical findings). Moreover, the ALJ may reject a physician's opinion if it is inconsistent with the physician's own treatment notes. *See Weetman v. Sullivan*, 988 F.2d 20, 23 (9th Cir. 1989).

Finally, a treating physician's prescribed work restrictions that are based on a patient's subjective characterization of symptoms are reasonably discounted when the ALJ finds the plaintiff less than credible. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). As the ALJ found the plaintiff's description of his symptoms less than credible in this case, which plaintiff does not challenge, it was reasonable for the ALJ to discount Dr. Rieger's opinion because it was based on these less than credible statements. AR at 22. Accordingly, the ALJ did not err by affording "little weight" to Dr. Rieger's opinion.

### 3. Gary Gaffield, M.D.

Dr. Gaffield performed a consultative examination of the plaintiff on March 16, 2006. AR at 288-93. As part of his examination, Dr. Gaffield also reviewed clinic notes dealing with

wrist pain, tobacco use, history of emphysema, multiple allergies, and chest pain, as well as lumbar spine and cervical spine x-rays "revealing spondylosis." AR at 288. Upon presentation, plaintiff alleged that he suffered several fractures of his lumbar and cervical spine after an on the job accident in the late 1970s, and that he was unable to return to active construction work after this accident. AR at 288. Plaintiff reported muscle spasms in his lower extremities and a burning type pain and shaking in his legs, which caused him to resign from his job as a bus driver. AR at 288. Plaintiff told Dr. Gaffield that he can walk only about 10-20 feet before sitting down, and he can only sit for about 20 minutes before his legs started to spasm and therefore spends most of the day lying down. AR at 288. He further reported blackout spells resulting in falls, longstanding dyspnea, and forgetfulness. AR at 288-89. With regard to activities of daily living, plaintiff reported that his wife assists him with bathing and dressing, as he is unable to put on his own socks. AR at 289.

Dr. Gaffield noted that it appeared "quite difficult for the claimant to ambulate with a walker from the waiting room to the exam room. It is very difficult for him to transfer from the walker to the chair . . . He needs the assistance of at least one strong person." AR at 291. Dr. Gaffield diagnosed plaintiff with "intention tremors in both the upper and lower extremities," bilateral leg pain with spasms, dyspnea, by history, and memory loss. AR at 293. He also wrote "consider underlying neurogenic degenerative disease." AR at 291. Dr. Gaffield concluded that because of plaintiff's "significant leg spasms, tremors, and being confined to a walker," plaintiff cannot be expected to stand, walk, or sit for eight hours during an eight-hour workday and should avoid carrying objects due to his need for a walker. AR at 293. He also opined that plaintiff should rarely bend, stoop, or crouch, and only occasionally manipulate objectives or perform repetitive or fine movements. AR at 293.

The ALJ found that "given the significant inconsistencies in the claimant's subjective reports," Dr. Gaffield's "estimations of the claimant's functionality are not consistent with the record as a whole." AR at 23. Specifically, the ALJ opined that it "seems unlikely that the claimant could be experiencing the extent of symptoms he alleged during this examination, including his allegations that he required a walker to ambulate, yet, there are very few pre-dating medical records and none that record this level of limitation. The claimant clearly had access to medical care, but the records are noticeably absent." AR at 24. The ALJ pointed out that "the claimant was working just five months prior to this exam and his employer and co-worker did not witness this kind of impairment." AR at 24. Finally, the ALJ noted plaintiff's lack of credibility, including the fact that "[n]o such cause was identified for the claimant's alleged extremity weakness, either cardiological or neurological." AR at 24. As a result, the ALJ did not adopt Dr. Gaffield's opinion, although he did limit plaintiff "to the performance of a range of sedentary work." AR at 24.

Plaintiff contends that the ALJ erred by rejecting Dr. Gaffield's opinion, because "Dr. Gaffield's opinion of limitations was largely based on his objective findings on examination." Dkt. 14 at 9. In addition, although "the ALJ appeared to doubt that Plaintiff needed a cane or walker, examinations of record consistently note that he is using an assistive device and that he has problems with his gait, indicating that this is necessary." AR at 9. Plaintiff contends that "the ALJ also erred when he rejected Dr. Gaffield's opinion because Plaintiff's 'employer and co-worker' did not witness this degree of impairment." *Id.* Specifically, plaintiff acknowledges that the Social Security Administration's Cooperative Disability Investigations Unit submitted a Report of Investigation ("CDIU report") pertaining to the plaintiff, and a police detective went "to Plaintiff's home, to speak with his present and former neighbors, and

to speak with individuals at his former workplace . . . The detective's report regarding his conversations with these individuals states that they had no indication that he was injured or disabled." *Id.* However, plaintiff argues that the ALJ erred by relying upon the CDIU report, and also erred by failing to request additional medical records from the Veteran's Administration ("VA") to help clear up this issue. Plaintiff asserts that "it is possible that Plaintiff's symptoms worsened after he stopped working, such that the limitations noted by Dr. Gaffield were not present while he was working." *Id.*

The Commissioner responds that given the significant inconsistencies in plaintiff's subjective reports, the ALJ did not err in rejecting Dr. Gaffield's opinion. Dkt. 15 at 7. In addition, the Commissioner points out that as part of the CDIU investigation, plaintiff's neighbors reported that plaintiff did not use a cane, let alone a walker, to ambulate and "appears to get around just fine." *Id.* (citing AR at 218). The neighbor also reported that plaintiff drove his vehicle regularly, which contradicts plaintiff's testimony. *Id.*

The ALJ provided several specific and legitimate reasons for rejecting Dr. Gaffield's opinion. As the ALJ found, Dr. Gaffield appeared to rely heavily upon plaintiff's subjective reports during his consultative examination. Furthermore, most of Dr. Gaffield's own observations of plaintiff pertained to limitations stemming from the fact that he was apparently "confined to a walker." In light of the contrary evidence contained in the CDIU report, plaintiff has not shown that the ALJ erred by questioning this conclusion.

In addition, contrary to plaintiff's argument, the ALJ properly considered the CDIU report as evidence in this case. *See* 42 U.S.C. § 405(b)(1); *Richardson v. Perales,* 402 U.S. 389, 400, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) ("strict rules of evidence, applicable in the courtroom, are not to operate at social security hearings so as to bar the admission of evidence

otherwise pertinent"). This consideration does not establish bias, as evidenced by a number of recent cases. *See, e.g., Robert v. Astrue*, 688 F.Supp.2d 29, 37 (D. Mass. 2010) (CDIU report "provides ample support for the ALJ's decision denying benefits"); *Knox v. Astrue,* 660 F.Supp.2d 790, 800 (S.D. Tex. 2009) (remanding, in part, because the CDIU report was insufficient to support the ALJ's decision); *Zargi v. Comm'r of Soc. Sec.,* No. CIV S–08–1677–CMK, 2009 WL 1505311, at *3 (E.D. Cal. May 27, 2009) (ALJ relied, in part, on CDIU report in discrediting plaintiff and rejecting the opinions of two examining physicians). The ALJ also did not rely solely on the CDIU report at any stage of his analysis.

Finally, plaintiff's assertion that earlier medical records from the VA *may* have contradicted the CDIU report because "it is possible that Plaintiff's symptoms worsened after he stopped working" is insufficient to establish that the ALJ erred in this case. Plaintiff has failed to identify any such evidence from the VA, and also failed to request the presence of the detectives at the disability hearing or submit interrogatories to the detectives to challenge the basis for their findings. *See* 20 C.F.R. § 404.950(d)(1) ("When it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are material to an issue at the hearing."); *Solis v. Schweiker*, 719 F.2d 301, 302 (9th Cir. 1983) ("interrogatories can adequately replace in-court testimony where factual questions such as foundation or expertise are at issue"). Accordingly, the ALJ did not err by assigning little weight to Dr. Gaffield's opinion. AR at 24.

*4.    Theodore Hegg, M.D.*

Dr. Hegg evaluated plaintiff on April 12, 2007, after plaintiff was referred by Dr. Rieger for an evaluation of his alleged syncopal or near-syncopal episodes. AR at 332. Plaintiff reported that his lower extremity weakness has caused multiple falls, ranging from once per week to once per month. AR at 332. Plaintiff also reported that he wore a Holter monitor in February, although it showed no significant ectopy. AR at 332. The monitor did, however, show occasional episodes of sinus tachycardia up to 120 with no serious arrhythmias noted. AR at 332. Although Dr. Hegg noted marked coronary risk factors, plaintiff denied experiencing "classic angina." AR at 333. Plaintiff did report "exertional dyspnea" related to his severe deconditioning and significant weight gain. AR at 333. As part of his evaluation, Dr. Hegg reviewed a February 6, 2007 chest x-ray showing "normal lung vascularity and normal cardiac size," an electrocardiogram showing "normal sinus rhythm and . . . a normal tracing," and lab work showing normal results. AR at 333. Based on his examination and interview of plaintiff, Dr. Hegg opined that plaintiff's "episodes are peculiar in so far as he has had multiple of them and has never really badly hurt himself. It almost sounds as though a lot of his falls are related to his neurologic problem, severe weakness, and falling on that basis." AR at 335. Given the other potential diagnoses, however, Dr. Hegg recommended a further cardiac event recording, an echocardiogram to assess cardiac function, and a pharmacologic myocardial perfusion scan to screen for coronary disease. AR at 335.

One month later, Dr. Hegg saw the plaintiff again to follow up regarding the various tests he had recommended. AR at 330. Dr. Hegg noted that plaintiff's echocardiogram revealed mild concentric hypertrophy, but normal left ventricular function and no evidence of valcular disease. The pharmacologic perfusion scan showed normal wall motion, "but a fixed

inferior defect which is most compatible with diaphragmatic attenuation artifact in this large obese man[.]" AR at 330. Dr. Hegg opined that he "strongly suspect[s] that he has significant autonomic neuropathy related perhaps to his back disease or to some other primarily neurologic disease, which results in orthostatic hypotension." AR at 331. Dr. Hegg noted that plaintiff "does not have any obviously identified structural heart disease and therefore, the risk of his syncope is mainly limited to possible injury from falling." AR at 331. In June 2007, plaintiff reported that he continued to experience the syncope episodes, leading Dr. Hegg to conclude that "the circumstantial evidence strongly point to orthostasis related to a peripheral neuropathy." AR at 327-28.

On March 14, 2008, Dr. Hegg completed a letter noting that multiple attempts were made to document an arrhythmia underlying plaintiff's alleged episodes, but no such documentation was successful. AR at 437. The echocardiogram and pharmacologic stress perfusion scan both revealed normal results. AR at 437. Dr. Hegg noted that "in summary I was unable to find any significant evidence of a structural heart disease other than evidence of hypertension and increased muscle mass in the heart secondary to high blood pressure." AR at 437. Although Dr. Hegg's working diagnosis has been orthostatic hypotension related to his degenerative neurologic condition, Dr. Hegg acknowledged that "it is always very difficult to document . . . any of his episodes." AR at 437. Dr. Hegg opined that plaintiff "obviously is extremely limited in what he can do mostly by his neurologic condition. I suspect the prognosis for recovery is extremely poor. I would not expect that this patient could do any type of full time work, certainly could not do manual labor or work that required any upright standing or even repetitive standing." AR at 437.

1   The ALJ concluded that "he did not find persuasive the opinion of the claimant's

2   cardiologist, Dr. Hegg. Dr. Hegg did not know the underlying cause of the claimant's alleged

3   syncopal episodes; however, he concluded that the claimant could not perform any type of full

4   time work and 'certainly could not do manual labor or work that required any upright standing

5   or even repetitive standing.'" AR at 24. The ALJ asserted that "[s]uch a conclusion is not

6   based on objective medical evidence. Further, Dr. Hegg is a cardiologist and, lacking more

7   specific reasons for his conclusion, I did not find persuasive his opinion that the claimant was

8   unable to work due to some non-cardiology related reason." AR at 24.

9       Plaintiff contends that "Dr. Hegg consistently noted that he believed Plaintiff's syncope

10  was due to orthostatic hypertension, which he noted on examination . . . The ALJ erred when

11  he found Dr. Hegg's opinion was unsupported." Dkt. 14 at 11. The Commissioner responds

12  that the ALJ properly "noted Dr. Hegg was a cardiologist and, lacking more specific reasons

13  for his conclusion, did not find persuasive his opinion Plaintiff was unable to work due to a

14  non-cardiology related reason . . . This was a specific and legitimate reason by the ALJ not to

15  assign weight to this opinion." Dkt. 15 at 10.

16      The ALJ's reasons for rejecting Dr. Hegg's opinions were specific and legitimate and

17  supported by substantial evidence in the record. Although Dr. Hegg administered numerous

18  tests to determine whether plaintiff's syncope episodes were related to a cardiac condition of

19  some kind, he was unable to identify the cause. As noted above, he "was unable to find any

20  significant evidence of a structural heart disease other than evidence of hypertension and

21  increased muscle mass in the heart secondary to high blood pressure." AR at 437. As a result,

22  Dr. Hegg hypothesized that plaintiff's episodes were related to a neurologic condition.

23  Specifically, he commented in April 2007 that "[i]t almost sounds as though a lot of his falls

24

are related to his neurologic problem, severe weakness, and falling on that basis." AR at 335. In May 2007 he remarked that he "strongly suspect[s] that [plaintiff] has significant autonomic neuropathy related perhaps to his back disease or to some other primarily neurologic disease[.]" AR at 331. Thus, Dr. Hegg's opinion that plaintiff was "extremely limited in what he can do mostly by his neurologic condition" was based on this hypothesis, rather than the results of his testing or any other objective medical evidence. AR at 437.

As Dr. Hegg is a cardiologist, but was not providing an opinion related to a cardiac condition, the ALJ could reasonably afford his opinion less weight. *See* 20 C.F.R. § 404.15.27(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Accordingly, Dr. Hegg's specialty was a specific and legitimate reason for the ALJ to reject his opinion regarding the severity of plaintiff's possible neurologic condition, and its potential effect on plaintiff's ability to work. The ALJ did not err.

VIII. CONCLUSION

As noted above, the role of this Court is limited. When the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld. *Thomas*, 278 F.3d at 954. Accordingly, the Court recommends that the decision of the Commissioner be AFFIRMED, and this matter be DISMISSED with prejudice. A proposed order accompanies this Report and Recommendation.

DATED this 1st day of December 2011.

*James P. Donohue*
_____
JAMES P. DONOHUE
United States Magistrate Judge